## AFFIDAVIT OF RYAN LANE IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Ryan Lane, being duly sworn, state:

### Introduction

1. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I am a Special Agent for the Federal Bureau of Investigation ("FBI"), currently assigned to the Boston, Massachusetts Field Office. I am currently assigned to the economic crimes squad, where my primary duties include investigating fraud and other white collar crimes. I have a bachelor's degree in accounting and am a Certified Public Accountant.

3. I submit this affidavit for the limited purpose of establishing probable cause to support a criminal complaint charging **IFTIKAR AHMED** and **SHALINI AHMED** with conspiracy to engage in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 1956(h) and 1957.

4. The facts in this affidavit come from my personal involvement in this investigation, interviews with witnesses, and my review of documents, records, and information provided by others, including the Internal Revenue Service-Criminal Investigation Division, and the Securities and Exchange Commission ("SEC"). This affidavit does not contain every fact learned during the investigation in this case, but only the information needed to support issuing the complaint.

### The Money Laundering Statutes

5. Under 18 U.S.C. § 1957(a), it is unlawful to "knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value of greater than $10,000

and is derived from a specified unlawful activity." Wire fraud, a violation of 18 U.S.C. § 1343, is a "specified unlawful activity" pursuant to 18 U.S.C. § 1956(c)(7)(A) and 18 U.S.C. § 1961(1).

6. The term "monetary transaction" includes a deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of a monetary instrument by or through a financial institution. 18 U.S.C. § 1957(f)(1). A "financial institution" includes an FDIC insured bank or a commercial bank. 18 U.S.C. § 1956(c)(6) and 31 U.S.C. § 5312(a)(2). The term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense. 18 U.S.C. 1957(f)(2). The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity. 18 U.S.C. §§ 1957(f)(3) and 1956(c)(9).

7. For a prosecution under 18 U.S.C. § 1957, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity. 18 U.S.C. § 1957(c).

### Background

8. IFTIKAR AHMED ("AHMED") and SHALINI AHMED ("S.AHMED") were married residents of Greenwich, Connecticut. From at least 2009 until 2014, AHMED and S.AHMED filed joint federal income tax returns through an accountant in Massachusetts.

9. From 2004 to 2015, AHMED was employed at Oak Management Corporation ("Oak"), a venture capital firm with offices in Norwalk and Greenwich, Connecticut. Oak advised several funds ("Oak Funds"). The Oak Funds used money from various investors to make investments in companies, particularly those involved in electronic or "e-

commerce" in Asia. The investors in the Oak Funds included individual and institutional investors, such as public pension funds.

10. AHMED worked at Oak as an investment professional and general partner for Oak Funds from in or about 2004 up to May 2015 in Connecticut. As a general manager at Oak, AHMED identified companies for the Oak Funds to invest in; recommended investments to the four senior managing partners at Oak; negotiated the terms of investments with the companies in which Oak invested; and managed the relationship with these companies, which at times included AHMED serving on the companies' boards of directors.

11. AHMED's compensation consisted of payments from Oak and the general partners of the Oak Funds. AHMED was paid a base salary and received additional compensation when the investment opportunities he recommended were particularly successful. Oak paid AHMED through electronic bank transfers ("EBT") to personal joint checking accounts that he shared with S.AHMED.

12. In 1998, S.AHMED earned a Bachelor's of Arts in Economics at Princeton University and in 2002 earned a Master's in Business Administration at Harvard Business School. From 2004 to 2012, S.AHMED was employed as a vice president in the Asset Management section of the Investment Management Division of Goldman Sachs in New York City.

### Overview of the Fraud and the Money Laundering Conspiracy

13. From at least December 2004 and continuing until December 2014, AHMED was involved in a scheme to defraud Oak and the Oak Funds of more than $50 million. One aspect of the fraud involved AHMED grossly inflating the purchase price of the deals that AHMED recommended to Oak and diverting the excess funds to bank accounts he

controlled. To facilitate the fraud and the laundering of the proceeds of the fraud, AHMED set up various bank accounts at Bank of America ("BOA") that he represented to be associated with the companies in which Oak was investing, but which in fact were his own bank accounts registered to his home address. AHMED fraudulently represented to the bank that the accounts were "doing business as" ("d.b.a.") the entities involved in the deals, but in fact used the accounts to divert funds from Oak and to funnel the proceeds of the fraud to a joint account at BOA that AHMED and S.AHMED opened in the District of Massachusetts.

14. Once the proceeds of AHMED's fraud were transferred into the "d.b.a." accounts, the funds were immediately transferred to a joint checking or savings account that both AHMED and S.AHMED controlled. Between approximately July 2005 and January 2015, more than $50 million was transferred from four of the "d.b.a." accounts[1] to AHMED and S.AHMED's joint bank accounts. At times, the money was then transferred to S.AHMED's investment accounts at Fidelity Investments. Despite this influx of more than $50 million, AHMED and S.AHMED failed to claim the majority of these funds as income and between the years 2010-2014 submitted false tax returns to the IRS through their accountant in Massachusetts.

15. As further described below, AHMED and S.AHMED used the proceeds of AHMED's fraud, among other things, to conduct monetary transactions related to the April 2015 purchase of a luxury condominium in New York for approximately $8.6 million. In particular, on April 16, 2015, following AHMED's arrest on April 2, 2015 for securities fraud, S.AHMED wired $8 million in fraud proceeds for the purchase of the luxury

---

[1] AHMED's "d.b.a." accounts, each at Bank of America ("BOA") are described herein as BOA-9887, BOA-6367, BOA-9310, and BOA-3640.

condominium in New York City for approximately $8.6 million. On or about May 4, 2015, S.AHMED purchased first class airline tickets for herself and the couple's two children to Mumbai, India with a departure date of May 29, 2015. On or about May 8, 2015, the day after a U.S. District Court Judge in Connecticut issued a temporary restraining order for AHMED's assets up to approximately $55 million, S.AHMED attempted to transfer approximately $250,000 from her Fidelity investment account to India for purported medical expenses for her mother-in-law (AHMED's mother) in India. On or about May 13, 2015, the SEC unsealed and publicly announced the filing of a civil complaint that alleged details about AHMED's involvement in a widespread fraud involving Oak. Days later, on May 16, 2015, AHMED fled the United States to India in violation of his conditions of release on an expired passport. More recently, on June 11, 2015, S.AHMED wired $671,318 in funds directly traceable to AHMED's fraud in an account at Barclays and falsely claimed the funds were for a "real estate closing."

### IFTIKAR AHMED's Scheme to Defraud

A. **Ahmed's Fraud in Connection with Oak's Investment in "Company A"**

16. Between December 2007 and October 2011, AHMED defrauded Oak and an Oak Fund of approximately $12 million in connection with Oak's investment in a Korean company referred to below as "Company A."

17. The first part of the fraud involved AHMED misrepresenting the actual price of the deal and diverting the excess funds to his own bank account. In or around December 2007, AHMED arranged for one of Oak's funds to purchase shares of a company in Seoul, South Korea referred to herein as "Company A." According to the purchase agreement for the deal, the price of the shares was 40 billion Korean Won. AHMED inflated the

5

price by falsely representing to Oak that the 40 billion Korean Won equaled a purchase price of $47.5 million in U.S. dollars. In fact, a proper conversion of 40 billion Korean Won yielded a price of just $42.8 million U.S. dollars.

18. AHMED directed Oak to split the payment into two different accounts: $45 million to a bank account in South Korea and the remaining $2.5 million to a BOA account ending in 9887 ("BOA-9887"). AHMED claimed that BOA-9887 was going to be used for the purchase of the shares and that the account was in the name of Company A in Seoul, South Korea. In fact, the account was not Company A's account. Instead, BOA-9887 was an account that AHMED opened on the same day as the transaction, on December 18, 2007, with a deposit of $500. AHMED listed Company A's name on the account, though the address on the account was his home address that he shared with S.AHMED in Greenwich, Connecticut.

19. Following AHMED's instructions, on or about December 18, 2007, Oak wired $45 million to the account in South Korea and another $2.5 million to the BOA-9887 account. The same day, AHMED transferred $2.5 million out of BOA-9887 and into two other BOA accounts - both controlled by AHMED and S.AHMED - in three different on-line bank or "book" transfers:[2] a transfer of $999,999 and $500,002 to AHMED and S.AHMED's joint BOA savings account ending in 9566 ("BOA-9566"), and a transfer of $999,999 to a BOA account ending in 3754 ("BOA-3754"), a joint checking account that AHMED and S.AHMED opened in the District of Massachusetts at Fleet Bank in Boston.[3]

---

[2] "Book" transfers or on-line banking transfers are intra-bank transfers, transfers between accounts at the same bank or financial institution.
[3] In 2004, Fleet Bank merged with BOA and all its banks and branches were converted to BOA.

6

20. The second part of the fraudulent scheme with Company A deal involved the excess funds Oak had paid to Company A. Unbeknownst to Oak, not only did Oak transfer $2.5 million to AHMED's personal account, Oak's payment of $45 million was approximately $2.2 million above the actual purchase price of $42.8 million. AHMED directed Company A to wire the money to an account at BOA ending in 9310 under the name OIP Advisors ("BOA-9310"). The BOA-9310 account was in fact an account that AHMED had opened under his own name and address but which was also listed as "DBA OIP ADVISORS." On or about January 10, 2008, the day after receiving the money in the BOA-9310 account, AHMED moved this money from BOA-9310 in three on-line bank transfers – two in the amount of $999,999 and one in the amount of $202,052 – to BOA-3754, AHMED and S.AHMED's joint checking account at BOA.

21. The third aspect of AHMED's fraud in connection with Oak's investment in Company A involved AHMED's submission of fraudulent invoices to Oak. In 2009, Oak made a tender offer to Company A that resulted in Company A being taken private and delisted from the Korean Stock Exchange. On or about October 29, 2009, AHMED presented Oak with a fraudulent invoice of approximately $2.1 million purportedly from Company A for "Delisting Fees" and legal fees. At AHMED's direction, Oak thereafter wired the funds to BOA-9887. The next day, on October 30, 2009, AHMED transferred approximately $2.1 million in three different on-line bank transfers to BOA-3754 (AHMED and S.AHMED's joint account) in two transfers of $999,999 and one transfer of $100,000.

22. AHMED thereafter submitted three additional fraudulent invoices that were purportedly from Company A for various "incentive payments" arising from Oak's sale of Company

A's shares. On each occasion, AHMED had Oak transfer the funds to an account Oak understood belonged to Company A, and then immediately transferred the money to BOA-3754, the joint account that AHMED had opened with S.AHMED.

23. First, in November 2011, AHMED submitted a fraudulent invoice purportedly from Company A for a "Management Incentive Payment" to Oak and requested a wire of approximately $3.1 million. The invoice included wire transfer instructions for an account at BOA ending in 6367 in the name of Company A ("BOA-6367"), another account that AHMED opened under his own name but was listed as "doing business as" Company A. Following these instructions, on November 28, 2011, Oak wired $3,113,981 to BOA-6367. The same day, AHMED transferred almost this entire amount to BOA-3754 in on-line bank transfers of $3 million and $113,969.

24. Second, on April 10, 2013, AHMED presented Oak with another purported invoice from Company A for approximately $1.56 million for the payment of a "Management Incentive Payment." The invoice again contained wiring instructions for BOA-6367. Following these instructions, on April 11, 2013, Oak wired the approximately $1.56 million ($1,556,990) to BOA-6367 which it believed to be a Company A account. The same day on April 11, 2013, AHMED transferred the entire $1,556,000 to BOA-3754 in two separate on-line bank transfers of $999,999 and $556,991.

Third, on April 23, 2013, AHMED presented Oak with a purported invoice from Company A for approximately $623,000 for an "Advisor Fees Reimbursement." The invoice again contained wiring instructions for BOA-6367. Following these instructions on April 30, 2013, Oak wired $622,796 to BOA-6367. The same day, AHMED transferred this same amount, $622,796 in an online bank transfer to BOA-3754.

### B. Ahmed's Fraud in Connection with Oak's Investment in Company B

25. In August 2014, AHMED recommended that one of Oak's funds purchase shares in a company referred to herein as "Company B," an e-commerce company operating in Asia. AHMED recommended that Oak purchase those shares, not directly from Company B, but from a holding company based in the British Virgin Islands referred to herein as "Parent." AHMED sat on the board for Parent and negotiated the price for the deal with both Oak on one-side and Parent on the other.

26. AHMED represented to Oak that the purchase price for the shares was $3,544,773, but at the same time informed Parent that the purchase price was only $1.5 million. Based on AHMED's representations, Oak approved the deal.

27. On or about August 12, 2014, AHMED submitted a check request to Oak for the transfer of approximately $3.544 million to an account that AHMED indicated belonged to Parent, but that in fact was AHMED's own personal account at BOA, an account ending in 3640 ("BOA-3640"). AHMED set up BOA-3640 in his own name and home address that he shared with S.AHMED but listed it as "doing business as" ("d.b.a.") Parent. Based on AHMED's fraudulent representations, the same day, Oak wired $3,544,773 to the BOA-3640 account.

28. Days later, on or about August 15, 2014, AHMED transferred $2 million of the approximately $3.544 million in an on-line banking transfer from BOA-3640 to BOA-3754, the joint checking account held by AHMED and S.AHMED. This book transfer funded a check of the exact same amount, $2 million that AHMED wrote to "Shalini A. Ahmed." S.AHMED then deposited the check into one of her investment accounts at Fidelity ending in 7540 ("FID-7540"). Days later, on or about August 18, 2014, AHMED

9

transferred an additional $44,113 and $600 from BOA-3640 to BOA-3754. In total these three transfers from BOA-3640 to BOA-3754 equal almost exactly the difference between the approximately $3.544 million price that Oak believed it was paying for the deal and the actual price of $1.5 million.

29. As further described below, on or about October 29, 2014, S.AHMED opened an account at Barclay's Bank in her own name using $1 million of fraud proceeds from FID-7540. On or about June 11, 2015, S.AHMED transferred approximately $640,000 in fraud proceeds in a wire transfer she falsely claimed was for a real estate closing.

C. **AHMED's Fraud in Connection with Oak's Investment in "Parent"**

30. Since approximately 2010, one of Oak's funds held a substantial investment in the BVI holding company referred to above as "Parent." Parent owned a controlling interest in a company referred to herein as "Venture Party 1," an e-commerce business based in Asia. In 2012, a company referred herein as "Joint Venture Party 2," a company in China, and "Joint Venture Party 1" agreed to form a joint venture, referred to herein as "Company C," a Hong Kong company, to operate an e-commerce business.

31. In December 2014, AHMED recommended to Oak that one of its funds make an investment in Company C (the joint venture for an e-commerce business between Joint Venture Party 1 and 2). At the time of AHMED's recommendation, Joint Venture Party 2 was seeking to sell its stake in Company C. AHMED recommended to Oak that an Oak Fund purchase Joint Venture Party 2's shares in Company C for $20 million. As part of his recommendation, on or about December 15, 2014, AHMED submitted a document called a "Pre-Commitment Investment Report" to the managing partners at Oak. The report reiterated that the purchase price for the shares was $20 million.

10

32. Based on AHMED's recommendation, Oak approved the $20 million investment in Company C. After the proposal was approved, AHMED directed Oak to wire $2 million of the purchase price to a HSBC bank account for Joint Venture Party 2 and $18 million to account that AHMED claimed to belong to Parent at BOA ending 3640 ("BOA-3640").

33. In fact, BOA-3640 was not associated with Parent but rather was an account AHMED had opened at BOA under the name "Ifitkar Ali Ahmed Sole Prop DBA [Parent]." The address for the account was listed as AHMED and S.AHMED's home address in Greenwich, Connecticut. Based on AHMED's representations, on or about December 19, 2014, Oak agreed to make the $20 million investment to purchase Company C's shares and wired $2 million to Joint Venture Party 2 at HSBC and $18 million to BOA-3640.

34. On or about January 12, 2015, the $18 million in fraud proceeds was transferred in two on-line banking transfers from BOA-3640 to BOA-3754 (AHMED and S.AHMED's joint checking account). Prior to the $18 million transfer, BOA-3754 had a balance of approximately $22,000.

**Unexplained Wealth in AHMED and S.AHMED's Joint Account**

35. Both AHMED and S.AHMED regularly used BOA-3754 for day-to-day banking activity such as the payment of utility bills, phone bills, school tuition and also for AHMED to receive his legitimate compensation (salary and bonuses) from Oak. S.AHMED frequently wrote checks from BOA-3754. As described above, between approximately July 2005 and January 2015, more than $50 million was transferred from four of the "d.b.a." accounts to AHMED and S.AHMED's joint bank accounts, including BOA-

3754. Furthermore, according to BOA, each of AHMED's accounts at BOA – including his joint accounts with S.AHMED and his fraudulent d.b.a. accounts - were linked together and electronically accessible through a common log-in name and password.

36. The same day, on or about January 12, 2015, AHMED signed a check from BOA-3754 payable to "Shalini A. Ahmed" (S.AHMED) in the amount of $18 million. Bank records reveal that S.AHMED endorsed the back of the check and the same day deposited it into one of her investment accounts at Fidelity, an account ending in 7540 ("FID-7540") that was established in March 2013. Prior to the $18 million deposit, the balance of FID-7540 was approximately $4.4 million. As further described below, S.AHMED then used a portion of this $10 million to purchase of a second condominium at 530 Park Avenue in New York City for a purchase price of about $8.6 million. In December 2013, AHMED and S.AHMED had purchased another unit at 530 Park Avenue for approximately $9.3 million.

37. In contrast to the $22.5 million that went into S.AHMED's Fidelity account, the legitimate compensation that AHMED received from Oak in 2014 was far less, $1,164,489. On AHMED and S.AHMED's 2014 federal income tax return, AHMED and S.AHMED reported earning $1,167,004 in salary and wages and a total of $2,218,302 in income. Similarly, in 2013, in addition to this incoming flow of more than $2.1 million in fraud proceeds coming into BOA-3754, the legitimate compensation that AHMED received from Oak in gross pay was $2,946,020. However, the total amount of income that AHMED and S.AHMED claimed on their 2013 federal income tax return was only $3,311,659.

38. Based on my training and experience, I understand that one of the reasons why individuals purposely fail to report income on their tax returns is because they know the money is not legitimate income, but rather ill-gotten gain.

**Purchase of 530 Park Avenue, Apt. 12F for approximately $8.6 million**

39. On or about March 12, 2015, $10 million was transferred from FID-7540 to a Fidelity Investment account ending in 6394 ("FID-6394") that S.AHMED opened the same day in her name. As further described above, this $10 million transfer was funded by the deposit of the $18 million in fraud proceeds on January 12, 2015. The next day, on or about March 13, 2015, S.AHMED caused $860,000 to be wired from FID-7540 to an account at Northern Trust Company for a 10% deposit for the purchase of 530 Park Avenue, Apt 12F, New York, NY.

40. As further described below, on or about April 20, 2015, following AHMED's arrest on insider trading/securities fraud charges on April 2, 2015, S.AHMED completed the purchase of 530 Park Avenue, Apt. 12F. The property was purchased in the name of another New York limited liability company called, "DIYA Real Holdings, LLC" created in February 2015. The property was purchased with the proceeds of AHMED's fraud, including the $860,000 down payment on March 13, 2015 before AHMED's arrest and the transfer of $8 million following AHMED's arrest.

**Conclusion**

41. Based on the foregoing, I submit there is probable cause to believe that between at least in or about December 2007 and continuing until at least in or about June 2015, **IFTIKAR AHMED** and **SHALINI AHMED** conspired with each other to knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value

greater than $10,000 that was in fact derived from specified unlawful activity, namely wire fraud, in violation of 18 U.S.C. § 1343, all in violation of 18 U.S.C. § 1956(h) and 1957.

_____
Ryan Lane
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this 3rd day of August, 2015, at Boston, Massachusetts.

_____
HON. MARIANNE B. BOWLER
United States Magistrate Judge
District of Massachusetts

14